[Criminal No. 729.   Filed December 23, 1930.]

[294 Pac. 625.]

LEONARD COLLINS, Appellant, v. STATE, Respondent.

Mr. W. F. Timmons and Mr. J. Fred Hoover, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Riney B. Salmon, Assistant Attorney General, and Mr. H. H. Baker, County Attorney, for the State.

ROSS, J.—By information, the county attorney accused defendant and one Charles Antone of the crime of murder, the offense being described as follows:

"The said Charles Antone and Leonard Collins on or about the 20th day of Oct. 1929, and before the filing of this information, at, and in the county of Yuma, State of Arizona, did then and there, wilfully, unlawfully, feloniously, deliberately and with premeditation and malice aforethought, kill and murder one Henry Cornell, a human being. . . . "

Defendant Collins demanded a severance, and was tried alone. From a verdict and sentence of manslaughter, he prosecutes this appeal.

He first claims that the information is insufficient, in that it fails to state the means employed by defendant to kill and murder deceased, or the kind and character of the wounds inflicted, or that the wounds were mortal.

"Whatever the rule in this regard may be in other jurisdictions it is at rest here. The indictment or information is not bad in failing to describe the means employed to effect death, or in failing to describe the wounds causing death. *Molina* v. *Territory,* 12 Ariz. 14, 95 Pac. 102; *People* v. *Suesser,* 142 Cal. 354, 75 Pac. 1093. We early adopted the California criminal procedure and the construction placed thereon by that state's courts." *Azbill* v. *State,* 19 Ariz. 499, 172 Pac. 658, 659. See, also, *Marquez* v. *Territory,* 13 Ariz. 135, 108 Pac. 258.

Defendant contends the *corpus delicti* was not proved.

"In felonious homicide the *corpus delicti* consists of two elements: First, the fact of death, as the result; second, facts and circumstances showing the criminal agency of the person charged with the crime, as the means." *Edwards* v. *Territory,* 8 Ariz. 342, 76 Pac. 458, 460.

The evidence on this point is as follows: Defendant Collins, Charles Antone and the deceased, Henry Cornell, Yuma Indians, came together on the streets of the city of Yuma some time in the forenoon of October 19, 1929. Before Collins joined the other two, the latter had been drinking denatured alcohol, had consumed perhaps a half bottle. After Collins joined the defendant and Antone, the three of them drank about two and one-half bottles of the stuff. (The capacity of these bottles is not shown by the evidence.) The place selected by them for their carousal was an isolated spot on a slough of the Colorado River, well shielded from view by rank growth of weeds and willows. It was not far from

the Southern Pacific depot, 150 to 200 yards east. All was well and peaceful during the time (some four hours) it took to consume the liquor. What then happened the defendant and Antone disagree on. Defendant says deceased started to sing and requested him to sing; that he told deceased he could not sing, never did sing; that deceased kept on singing; that he told him he was making too much noise and they would be arrested; that he then moved away from his companions to a shady place and sat down; that after that Antone criticised deceased's singing, telling him he did not know how to sing; that deceased said to Antone, "If you know how to sing, why don't you sing?"; that they, Antone and Collins, started to fight; that the former picked up a stick and struck deceased on the head, knocking him down, and struck him two times after he had fallen; that defendant then grabbed Antone and nothing else happened.

Antone's version is that he and deceased were singing a song, an Indian song, and defendant said, "Keep quiet"; that they kept on singing; that defendant knocked him into the water, and then ran after a stick and with it hit deceased twice.

Witness Marcus Pacho, who was working for the Southern Pacific, testified that a few minutes after 3 P. M. he saw defendant and Antone coming from the direction of the place where deceased was found; that just before he saw them he heard crying and hollering, then groans and moans in the locality from whence they came; that he heard hitting, "like hitting a tree, or a human, or anything." This witness and two other persons then went to the place whence the noises had come, and found deceased lying in the mud, wounds all over his face and head, and entire left scalp torn away and cut into small pieces.

In the face of this testimony, we think there is little to the claim of defendant that the *corpus delicti*

was not proved. There can be no question that deceased died a violent death at the hands of one or both of his companions. Whether his death was the result of the acts of defendant was, under the evidence, a question for the jury.

At the close of the case, defendant made a motion for an instructed verdict on the ground of fatal variance between the allegations of the information and the evidence, in that the information alleged that Henry Cornell died instantly, in Yuma county, Arizona, and the evidence showed that he died, some eleven hours after he was injured, in Imperial county, California. Our statute on the subject of jurisdiction in homicide cases, when the injury and the death are not in the same county or state, answers defendant's contention. It is as follows:

"The jurisdiction of a criminal action for . . . murder or manslaughter, when the injury which caused the death was inflicted in one county, and the party injured dies in another county or out of the state, [is] in the county where the injury was inflicted. . . . " Section 4924, Rev. Code 1928.

Whatever the rule at common law or in other jurisdictions, the above statute controls here.

Error is assigned upon the court's refusal to permit defendant to prove statements made by deceased while in the hospital, some two hours after his injury. It is contended that such statements were admissible upon two grounds: (1) As a dying declaration, and (2) as part of the res gestae.

Dying declarations are taken out of the hearsay rule on the theory that a person in extremis speaks under the same solemn obligation as one testifying under the sanctity of an oath. It is indispensable that the declarant, at the time the declaration is made, be laboring under the influence of impending death. It is not enough that he be fatally ill or that dissolution be imminent, if he be not conscious

thereof. The party offering dying declarations must first show, either by the express language of deceased or by the indubitable circumstances, that they were made under a sense of impending death. The evidence on this preliminary question was that decedent said nothing, one way or the other, about dying. The doctor who attended him testified he died from compression of the brain, that is, from pressure on the brain by escaping blood from a broken blood vessel within the skull. He nowhere states that he thought deceased's wounds were fatal, nor does any other witness.

Deceased received his injuries shortly after 3 P. M. When he was found a few minutes later he was in a stupor, or perhaps unconscious. He was taken to the hospital on Indian Hill, across the Colorado River in California, about 5 P. M. Just after he arrived at the hospital an Indian witness says he became and remained "in the right mind" for about one hour, when he lapsed into unconsciousness and died at 2 A. M. October 20th. It was what he was supposed to have said during this lucid interval that defendant insists was a part of the *res gestae* and should have been admitted as such. If the record disclosed in any way what was said by deceased, as that defendant "beat him up," or that Antone did it, or that defendant and Antone together did it, it would be necessary that we determine whether such declarations or statements were a part of the *res gestae*. Defendant asked permission of the court to be allowed to make the offer in the presence of the jury. This offer was refused, whereupon defendant's counsel said: "The record . . . now does not disclose, either before the court or before the jury, what our offer of proof is going to be." The matter ended there.

As we understand the law, there is and could be no rule requiring a party to first obtain the court's

permission to make an offer of proof. The situation of a litigant invites evidence to sustain his position. Neither the court nor opposing counsel can know whether evidence a party desires to present is competent or material until it is proffered. That it must be proffered in correct form is settled. 26 R. C. L. 1032, § 35; 4 C. J. 758, § 2701; *McGinness* v. *State*, 4 Wyo. 115, 31 Pac. 978, 53 Pac. 492. The defendant's proposition amounted to this: That he would proffer his evidence provided he was permitted to do so in the presence of the jury, otherwise he would not. It is the province of the court to pass upon the competency or materiality of evidence, and frequently it is better that it be done in the absence of the jury. Sometimes the party proffering evidence well knows that it is inadmissible for any purpose other than to excite the sympathy or bias or prejudice of the jury. If such a proffer can be read or stated in the presence of the jury, it may be the profferer has accomplished everything that he desired. For that reason we think it is within the discretion of the court to require that the proffer be made in the absence of the jury.

These are the only errors assigned, but defendant in his brief argues that, because Antone was jointly charged with him, he was disqualified as a witness, and that the court erred in permitting him to testify. He relies on section 5046 of the Revised Code of 1928 as authority for his contention. Whatever may be said of the effect of that section on the right of a defendant to testify against his co-defendant, it has no application where there is a severance as in this case. This was settled by this court in *Lujan* v. *State,* 16 Ariz. 123, 141 Pac. 706. In that case the question was as to the right of the defendant on trial to use his co-defendant as a witness in his behalf. We held that he could. We see no reason why the same rule should not be invoked by the state.

Section 5046, *supra,* protects a person accused of crime from being compelled to be a witness against himself. However, if such a person voluntarily testifies, his testimony is competent, not only as against himself, but as against his co-defendant. This is true whether they are being tried together or separately. California has the same statute, and the courts of that state in passing on it have held as herein stated. *People* v. *Yeager,* 194 Cal. 452, 229 Pac. 40; *People* v. *Snyder,* 74 Cal. App. 138, 239 Pac. 705.

Finding no error in the record, the judgment is affirmed.

LOCKWOOD, C. J., and McALISTER, J., concur.